## ALLEN v. RAMSEY et al.

No. 22728.    Feb. 5, 1935.

Eakes & Robinson, for plaintiff in error.

Allen & Jarman, for defendants in error W. R. Ramsey and R. M. Franks.

Allen K. Swan, J. B. Durfee, Paul E. Taliferro, and Charles W. Mason, for defendants in error Ronald S. Mason, C. H. Wright, and Ralph Johnson.

Walter L. Kimmel, for defendants in error Hargrove Hudson and George Deck.

PER CURIAM. This action was brought by the plaintiff, J. M. Allen, in the district court of Tulsa county. The action is one sounding in tort and is brought against the defendants, W. R. Ramsey, R. M. Franks, Ronald S. Mason, C. H. Wright, Hargrove Hudson, George Deck, and Ralph Johnson. All of the defendants are residents of Tulsa county except Ramsey and Franks, who are residents of Oklahoma county.

Plaintiff's petition alleges in substance that on or about the 26th day of January, 1928, the defendant W. R. Ramsey contracted with and employed ·the plaintiff to sell for him certain oil properties for an approximate consideration of $1,000,000, payable one-half in cash and one-half from oil runs, and that the plaintiff, acting under the contract, proceeded diligently in offering said properties and attempting to sell the same to various prospective purchasers, among them the Sunray Oil Corporation; that the said Sunray Oil Corporation declined the properties at the time they were offered, but subsequently, acting directly and through the · instrumentality and interference of the other

defendants, Franks, Mason, Wright, Hudson, Deck, and Johnson, responded to overtures and opened negotiations with the plaintiff's principal, W. R. Ramsey, and conspiring together, and with the said W. R. Ramsey, with the intent to defraud the plaintiff and deprive him of the fruits of his efforts in attempting to sell said properties, induced the said W. R. Ramsey to breach and abrogate his contract with the plaintiff and to sell the said properties to the said Sunray Oil Company for virtually the same consideration at which plaintiff had offered the properties and to pay the compensation for effecting such sale to the other defendants, thereby injuring and damaging the plaintiff in the sum of $60,000.

The petition further alleges that the plaintiff was the procuring cause of said sale, and, therefore, entitled to the commissions. The petition further sets out the efforts employed by the plaintiff in attempting to bring about a sale of the property to various and sundry persons, firms and corporations, including his efforts to the Sunray Company, and closes with a prayer for damages, which he claims were brought about and sustained by the tortious acts of the defendants, jointly and severally undertaken and consummated.

To plaintiff's petition, the defendants Mason, Wright, Hudson, Deck, and Johnson filed a special appearance and motion to quash, and the defendants Ramsey and Franks likewise filed a special appearance and objection to the jurisdiction of the court on the ground that the action was a fictitious attempt to bring the defendants Ramsey and Franks within the jurisdiction of the courts of Tulsa county by joining the other defendants, all of whom were residents of Tulsa county, and who had no interest whatever in the cause of action. These motions were overruled, and the defendants then filed their separate demurrers to the petition, the defendants Ramsey and Franks reserving the same jurisdictional grounds. And after the demurrers were overruled, separate answers were filed for the defendants, the defendants Ramsey and Franks still insisting on their jurisdictional grounds, and subsequently, and shortly before the case was called for trial, Ramsey and Franks filed their amended answer, which in substance was a general and specific denial of all of the matters complained of in plaintiff's petition. The amended answer does not specifically raise the jurisdictional question theretofore raised by them in the various pleadings theretofore filed.

The issues as thus joined came on for trial before the court in Tulsa county and a jury, and after the jury had been impaneled and before they were sworn, the defendants Ramsey and Franks objected to the impaneling of the jury on the grounds that the district court of Tulsa county had no jurisdiction, which objection was likewise overruled, and subsequently, and at the beginning of the taking of testimony, each of the defendants, separately, jointly, and individually, objected to the introduction of any evidence on the grounds that the petition and the opening statement of counsel for plaintiff failed to state a cause of action against the defendants, and in addition, the defendants Ramsey and Franks objected to the introduction of evidence for the further reason that the court was without jurisdiction to hear and determine the issues so far as these defendants were concerned.

The evidence disclosed that C. H. Wright was president of the Sunray Oil Corporation, and that Ronald S. Mason was a former secretary of the Sunray Oil Corporation, and still maintained an office adjoining the offices of the corporation at the time involving this controversy; that Hargrove Hudson and George Deck were lease brokers; that all of said defendants mentioned above were residents of Tulsa county; that W. R. Ramsey and R. M. Franks, who was an agent of Ramsey, were residents of Oklahoma county.

The plaintiff, Allen, testified in substance that for about 15 years he had been engaged in the oil brokerage business in Tulsa county buying and selling oil leases for others on a commission, and engaged in the real estate business for himself and sometimes as a broker for others; that he had been acquainted with the defendant Ramsey for about six years, and had, previous to this transaction, sold leases for him; that about the 18th day of January, 1928, he wrote Mr. Ramsey inquiring if he would let out any of his acreage in the Allen pool for a drilling contract, and that about the 20th day of January, he received a reply from Ramsey stating that he would be interested in such a proposition with a responsible party; that subsequently he 'phoned Mr. Ramsey at Oklahoma City, and that on or about the 27th day of January, 1928, the defendant Ramsey called him from New York, telling him that he might submit a proposition to a Mr. Crosby on 416 acres owned by Ramsey north of the river

in the Allen district, and authorized him to sell a half interest to Crosby in the property for $200,000, advising him further to get in touch with his agent, R. M. Franks, who would supply him with a map of the acreage, Franks being the land man for Ramsey; that, pursuant to the telephone conversation, he did call Franks, and Franks submitted to him a map of 416 acres, which he used in submitting the proposition to Mr. Crosby; that subsequently, and on February 2, 1928, he had a conference with Mr. Ramsey at Ramsey's office in Oklahoma City, in which Ramsey advised him that since his return from New York, the first well that he was drilling on this acreage looked so much better, he was going to raise the price to $1,000,000 for the whole 416 acres, and that he would complete three wells and would then sell the whole property for $1,000,000, one-half cash and one-half to be paid out of oil runs, and that Ramsey prepared another map of the 416 acres, advising him he could show it to the companies at Tulsa; and that, in addition to this, Ramsey furnished him another map of some other properties; that Ramsey and Franks were both present at the conference in Oklahoma City; that Franks prepared the maps at Ramsey's direction; that they discussed the amount of the commission that would be paid, in the event the plaintiff sold the properties, or either of them, and that it was agreed, in substance, that he was to be paid a commission of five per cent. on the 416-acre deal, referred to as the "Million Dollar Deal," and that if he made other sales of the other property, the commission should graduate to three or three and one-half per cent. Mr. Ramsey assured him that he would be paid a reasonable commission if he made the sale.

He further testified that between the date of his conference with Ramsey in Oklahoma City and the 25th day of February, he spent considerable time showing the 416 acres to various and sundry oil companies, and that between February 2nd and 10th he met a Mr. Templeton, who was connected with the Sunray in the land department, and inquired of him as to who would be the proper party to show the property for the Sunray, and that Templeton advised him to see Mr. Mason of the land department, Mr. Mason being Ronald S. Mason, one of the defendants herein; that about February 15th he went to the Sunray offices and talked to Mr. Mason, showed him his maps of the 416 acres, and that Mason, after looking over the map, said that it was too big a deal for them; that subsequently, and on or about

the 8th day of March, he was again in the Ramsey offices at Oklahoma City, and discussed various prospective purchasers of the property with Mr. Ramsey, and that on that occasion Mr. Ramsey said:

" 'Why don't you show it to that little fellow that went from here down there?' I said, 'What little fellow do you mean—Mr. Wright of the Sunray?' He said, 'Yes.' I said, 'I did show the proposition to the Sunray about the middle of February. I showed it to their land man, Mr. Mason, formerly of the Sinclair.' Mr. Franks was also present, and he said, 'Yes, I know Mr. Mason very well.' I said, 'They have been in the market for some property.' And he said, 'Well, why not show it to them again?' And I said, 'Well, I will. I will show it to them again.' That was on March 8th. I returned to Tulsa and by 'phone requested Mr. Templeton to make an appointment with me to see Mr. Wright. I called them on Monday, March 12th, and he said he would make an appointment with Wright for 11:00 o'clock the following day. At that time I went over to the office of the Sunray, showed the map to Mr. Templeton, explained the whole proposition to him, telling him the price was $1,000,000 for the 416 acres, half cash and half oil. Wright was busy, and I was unable to see him. Templeton then suggested that I leave my map with him, and he would show it to Mr. Wright. I returned in the afternoon, and the map was handed back to me by Harry Mack, who was helping Mr. Templeton. That on March 17th, I talked with Mr. Ramsey by 'phone concerning the Cosden offer and that I had shown the acreage to the Sunray, and that while they seemed interested, they said they wanted to complete a well they had been drilling in Kansas. That again on March 30th, I talked with Mr. Ramsey by 'phone and that he, Ramsey, said 'I don't want you to show my properties to anybody else.' I said, 'Well, what is the trouble, Mr. Ramsey?' He said, 'Well, your services have been very satisfactory to me, but the properties have been shown too much. I would rather you did not show them to anybody else.' "

The plaintiff's other witness, Mr. James B. Templeton, after testifying that he was a consulting geologist and had been connected with the Sunray Oil Corporation as geologist and assistant land man, occupying offices with them from February 1, 1927, to February 1, 1928, at which time they abolished the geology department, but kept him in a consulting capacity, substantially corroborated the plaintiff, Allen, relative to his conversation with Allen on February 6th or 7th, in which he suggested that Allen show the properties to Mr. Ronald S. Mason of the Sunray, and to the further transaction about the 13th day of March, when Allen called at the Sunray offices attempting to

see Wright, and, failing to see him, left the maps with the witness, Templeton, who presented the proposition to Mr. Wright, and in which Mr. Wright, together with Mason, hurriedly looked over the map, Wright saying: "Let's don't spend so much money today. We don't know what the well in Marion county is going to cost."

He testified further that the following day, March 17th, he was in Mr. Wright's office about noon, and that Wright remarked, looking out of the window, "There comes a man that is very close to Mr. Ramsey. I believe a good deal can be worked out on the Ramsey properties." That in a few minutes a Mr. Atkison, the man whom Wright had referred to, came to the office, and that Wright and Atkison had lunch together and then left the office; that on March 20th or 21st, Wright and Mason left for New York, returning the following Monday; that on March 31, Mason volunteered the information that he was resigning from the Sunray; that subsequently, either on April 4th or 5th, he was again in Mr. Wright's office, and Mr. Wright, Mr. Mason, and Mr. Ralph Johnson were consulting a production map of the Allen district, being the district in which the Allen properties were located, and advised the witness that they had secured some elevations and sand records of the district from Mr. Hargrove Hudson, and advised the witness that they were figuring on buying the Ramsey property; that on the 12th of April, Mr. Hamilton, the president of the Sunray, and several other gentlemen came from New York to Tulsa, and, together with Mason and Wright, inspected the Ramsey-Allen properties, and on the 16th of April announced that the Sunray had purchased the properties for $1,000,000, $400,000 cash and $600,000 in oil.

That he also heard a conversation between Mason and Wright and Deck, concerning the payment of the commission for the balance of the properties, and as to when Mason and Wright would get their commission. Allen then testified of reading in the newspaper of the sale of the properties to the Sunray, of his going to Oklahoma City with his lawyer and conferring with Ramsey and Franks relative to the payment of a commission to him, and of their declining to do so.

When the plaintiff had completed his evidence in chief and rested his case, the defendants separately demurred to the evidence, the demurrers were overruled as to Mason, Wright, and Ramsey and sustained as to Hudson, Deck, Johnson, and Franks.

The defendant Ramsey objected to further proceedings on jurisdictional grounds, which was again overruled.

The defendants then offered their testimony, denying any knowledge of the plaintiff having attempted to sell the property, which is the subject of this controversy, to the Sunray Oil Corporation; the defendant Ramsey admitted listing the property with the plaintiff for sale, fixing and agreeing to sell a half interest in the property for $200,-000, later withdrawing that proposition and authorizing the sale of the whole 416 acres for $1,000,000. He specifically denied that the listing of the property with the plaintiff was in any manner exclusive; and stated that the whole understanding was that he, Ramsey, should be consulted in each instance and furnished with the name of the prospective purchaser. That various and sundry prospective purchasers were discussed with him by the plaintiff, Allen, but that the name of the Sunray Oil Corporation was never at any time mentioned or suggested to him by Allen; that he had no knowledge that Allen had ever offered the property to the Sunray, and that on March 6th he advised the defendant by letter that if he did not receive a definite proposal for the sale of the properties within the next ten days, to drop the matter and call it closed; and that after that letter of March 6th, he received no further communication from Mr. Allen, either by letter, telephone or in person, until the plaintiff, Allen called upon him demanding a commission, after the property had been sold to the Sunray. That he refused to pay Allen any commission for the reason that he had withdrawn his properties from Allen several weeks before the deal was made with the Sunray, and did not know that Allen had ever offered said properties to the Sunray or discussed it with them; that he and his associates, Mr. Cox and Mr. Ecker, did pay a commission of $50,-000 to Mr. Hargrove Hudson.

All of the other defendants denied knowing that the plaintiff, Allen, had ever had anything to do with the selling of the property in controversy, or that it had ever been listed with him, the defendant Hudson admitting receiving the commission in the total sum of $44,868.69; that the reduced amount was due to the fact that they discounted the oil runs, thus reducing the commission from the original agreed sum of $50,000 to the sum above mentioned. That out of the commission actually paid, one-third of the sum was paid to Mr. Franks, one-third to Mr. Mason, one-third to Mr. Deck, and two-

ninths was retained by Mr. Hudson. That none of the other defendants participated in the commission.

At the conclusion of the evidence, and after both the plaintiff and defendants had announced that their cases were closed, defendants Wright and Mason moved for a directed verdict, which motion was by the court sustained.

The defendant Ramsey then renewed his objection to the jurisdiction of the court and to any further proceedings, and moved the dismissal of the action against him, which motion was likewise by the court sustained, and the action dismissed without prejudice.

Plaintiff in due time perfected his appeal to this court with numerous assignments of error; he excepted to the various orders made to the court during the progress of the trial, and more specifically the action of the court in sustaining the demurrer to his evidence, as to numerous of the Tulsa defendants, and in directing the jury to return a verdict at the close of all the evidence as to the remainder of the defendants.

In passing, we think it is well to note the fact that shortly after the refusal of the defendant Ramsey to pay to the plaintiff a commission, the plaintiff filed suit in the district court of Oklahoma county for a commission of $50,000 based upon the sale of the property to the Sunray Company, claiming that he was the procuring cause of said sale, and making all of the usual allegations in a petition in an action to recover a broker's commission for the sale of the property. When his case came on for trial in Oklahoma county, after the issues were duly joined, he first asked that the case be continued, and upon his motion the case was continued, and when it came on for hearing pursuant to the continuance, he again asked for a further continuance, which was denied. He then dismissed his suit in Oklahoma county against the defendant Ramsey, for a commission, and, subsequently, filed this action in Tulsa county, the theory of this action being to recover damages against all of the defendants, claiming that the defendants conspired against him to cheat and defraud and damage the plaintiff in his contract with the defendant Ramsey.

Regardless of the numerous assignments of error, the only material question for us to determine, in so far as the Tulsa defendants are concerned, is the sufficiency of the petition, and whether or not it states a cause of action against the Tulsa defendants in error, as we have heretofore designated them. In other words, assuming, without holding, that there is a conspiracy, does a conspiracy in such a transaction as was had in this case, give rise to a cause of action on the part of the plaintiff against the Tulsa defendants, to recover damages based upon the commission which he was entitled to receive, assuming that he had a legal contract and performed the same, entitling him to receive the commission from the defendant Ramsey?

The appellant contends that it is a question of fact, and that the case should have been submitted to the jury under proper instructions.

We recognize the rule frequently expressed by our court that:

"It is only when the evidence, with all the inferences the jury could justifiably draw from it, will be insufficient to support a verdict for plaintiff, that the court is authorized to direct a verdict for defendants; and, unless the conclusion follows as a matter of law, that no recovery can be had upon any view that can be properly taken of the facts which the evidence tends to establish, the case should be left to the jury under proper instructions."

We do not understand, however, this to be the real issue in this case, and, therefore, make no finding as to the sufficiency of the plaintiff's evidence. The question that we are to determine, as we view the record in this case, is whether or not any liability exists on the part of the Tulsa defendants. Because, if the action was improperly brought against the Tulsa defendants, the case would necessarily have to fail as to the defendant Ramsey, because when the case failed as to the resident Tulsa defendants, it would necessarily fail as to the nonresident defendant Ramsey.

In determining whether the trial court was correct in sustaining a demurrer to the evidence as to a portion of the Tulsa defendants, and in directing a verdict on behalf of the remaining Tulsa defendants and ordering a dismissal, we think the only question necessary to determine is (1) whether the plaintiff has a cause of action in tort; and (2) whether his petition stated a cause of action.

The allegations of the plaintiff's petition, we think, can be fairly summed up and fairly construed to embrace the following: (a) The allegation that there was a contract by which he was employed as a broker to sell certain property by the defendant Ramsey; (b) that he performed his contract by submitting the same to the Sunray Oil Company; (c) that thereafter the owner of said

property, Ramsey, conspired to make the sale through others; (d) that the sale was made to the Sunray Company; (e) that he, the plaintiff, was the procuring cause of said sale and had earned his agreed commission.

While it is true that the plaintiff prays for $60,000 as his damage, when the agreed commission was to be $50,000, we think the allegations of his petition allege no more nor no less than that he had earned an agreed commission, and that the result of the alleged conspiracy was to complete, and did complete, the contemplated sale by Ramsey to the Sunray Oil Company, and that the further result of the conspiracy was to cause or induce Ramsey not to pay the commission due plaintiff. In other words, if the allegations of plaintiff's petition are true, that he was the procuring cause of the sale, that his contract was fully performed, that his commission was fully earned, then the defendant Ramsey was indebted to him in the sum of $50,000, and the result of the conspiracy was simply that the conspirators, including Ramsey himself, resulted in inducing Ramsey to refuse to pay the debt which he owed the plaintiff.

Note the allegations of the petition:

"Said sale was consummated and this plaintiff's services and his efforts were and are the procuring cause thereof; and plaintiff was entitled to his reasonable commission which the defendant has failed and refused to pay * * * by reason of the wrongful and tortious acts hereinafter more fully described."

Plaintiff alleges that a reasonable commission on said sale was five per cent. of the selling price, or $50,000; and the further allegation:

"* * * Did cause the said defendant W. R. Ramsey to break and hold for naught, disregard, and nullify the contract hereinbefore described, which he had made with this plaintiff and to cause and did cause him * * * to exclude this plaintiff from the rights, privileges, remunerations and commission which he was entitled to receive under the said contract."

As we view this action, under the circumstances in this case, the only allegation of a breach on the part of Ramsey and the only final allegations of an inducement on the part of the other defendants, are that Ramsey became indebted to the plaintiff in the amount of $50,000 for a commission on a sale consummated, with the plaintiff as the procuring cause, and that Ramsey was induced to refuse to pay such commission in this case. It is a simple action for damages against the other defendants for in-

ducing Ramsey not to pay a debt which he justly owed. If the plaintiff, as he claims, has an enforceable contract with Ramsey, the transaction which he pleads would in no wise affect his rights, if he was the procuring cause in bringing about the sale between Ramsey and the Sunray Oil Company. Certainly he would have had a cause of action against Ramsey for his commission. He evidently believed that he did when he filed his suit in Oklahoma county to recover against Ramsey for the claimed commission. The transaction which he charges to be a conspiracy did not affect his rights in any particular. If no damages resulted by reason of the conspiracy and as a direct result thereof, then no cause of action could exist as between the plaintiff and the Tulsa defendants. The alleged conspiracy, therefore, only resulted in one thing, and that was to complete the plaintiff's contract with Ramsey, and cause the commission agreed to be paid by said contract to become immediately due and payable.

The rule seems to be well settled that an action by a creditor will not lie against one or more other persons for inducing a debtor to refuse to pay a debt, which he owes, especially when he is solvent, and when such other persons have or claim to have the right to collect themselves. Since the payment of the commission to the wrong party is in no wise binding upon the plaintiff, and his rights are in no wise affected thereby, his legal rights are not destroyed.

In the case of the Security State Bank of Enid v. Reger, 51 Okla. 397, 151 P. 1170, a somewhat similar question was involved, and the following rule announced:

"A general creditor cannot maintain an action against a third party who fraudulently conspires with a debtor to accept a mortgage on the debtor's personal property and foreclose the same in order to hinder and delay such creditor in the collection of his debt, such damage being too remote, indefinite and contingent to be the basis of an action."

This case quotes at length from the early Massachusetts case of Wellington v. Small, 3 Cush. (Mass.) 145, 50 Am. Dec. 719. The annotator in the note on page 722 of 50 Am. Dec., states as follows:

"That an action ex delicto on the case will not lie on behalf of a creditor against a third party who has assisted a failing debtor in making fraudulent conveyance of his property, seems to be sustained both upon principle and authority. An action on the case ex delicto can only be maintained upon proof of a direct, certain and material injury, * *

* as was well said by Shepley, J., in Moody v. Burton, 27 Me. 427-434. 'A debt due from one person cannot be satisfied by the recovery of damages from another person unconnected with, and a stranger to it, without some statute provision'."

The case of Cohen v. Hershfield, 9 N. Y. S. 512, is a case where the seller paid the commission to the wrong party. The real estate broker brought suit to recover damages against the seller and the party to whom the commission had been paid, alleging fraud and deceit. The court held that no cause of action existed as against the broker receiving the commission; that the fraud, if any, had been practiced upon the seller, and that the broker still had his cause of action against the seller for his commission, and that the payment of a commission to the wrong party in no wise affected the rights of the party justly entitled to receive the commission. The syllabus of the case reads as follows:

"Where a vendee fraudulently conceals the fact that she purchased through a broker employed by the vendor, and represents that a third person was the procuring cause of the sale, whereby the vendor is induced to pay the commissions to such third person, the broker cannot sue the purchaser for lost commissions, as the vendor's liability to him is not affected by such payment to the third person."

In the body of the opinion is a citation from Taylor v. Guest, 58 N. Y. 262, as follows:

"Applying the principle referred to, to the facts claimed by the plaintiff, it is apparent that he is not entitled to recovery against Lappart, the actual recipient of the commissions in question, and there is much less ground for holding the defendant. No fraud or misrepresentation was practiced upon the plaintiff. He parted with nothing on the faith of any representations of the defendant, and his right to commissions from Blumberg, at whose request he rendered the services leading to the sale, remains intact and is in no wise or manner abridged or affected by payment of the commissions to Lappart. How, then, has plaintiff been damaged. If fraud and deceit were intended, it was not upon plaintiff, but upon Blumberg, who paid the commission to Lappart. Blumberg might complain, but clearly, not the plaintiff, and fraud without damage does not confer a right of action."

In 5 R. C. L. 1090, 1091, it is said:

"Accurately speaking, there is no such thing as a civil action for conspiracy. There is an action for damages caused by acts pursuant to a formed conspiracy, but none for the conspiracy alone. While the crime of conspiracy may be committed without doing any overt act in pursuance of the combination, no civil liability is incurred for the conspiracy, but only for the overt acts of the conspirators. In other words, a mere agreement to do wrong is not actionable; but when the parties to such agreement do an overt act in furtherance of the illegal combination, resulting in injury to a third person, the conspiracy becomes actionable, and the conspirators are liable to the injured party for damages proximately flowing from their illegal conduct."

"In the ancient writ of conspiracy, the combination or confederation was the gist of the action, and this has sometimes been said to be the case in the modern action, with the qualification that it is necessary to show some act done in execution of it. The better view, however, is that the damage sustained, and not the conspiracy, is the gist of the action. * * *"

And in 12 Corpus Juris, page 581, the rule is stated as follows:

"For obvious reason, however, civil liability rests on different grounds and unless something is actually done by one or more of the conspirators, pursuant to the scheme and in the furtherance of the object, which act results in damage, no civil action lies against anyone. The gist of the action is the damage, and not the conspiracy. And the damage must appear to have been the natural and proximate consequence of defendant's act. * * *"

In the case of Hutchins v. Hutchins, 7 Hill (N. Y.) 104, 107, it is said:

"A simple conspiracy, however atrocious, unless it resulted in actual damage to the party, never was the subject of a civil action, not even when the old form of a writ of conspiracy, in its limited and most technical character, was in use."

These authorities clearly hold that the formation of a conspiracy alone is not actionable, but that it must be alleged and shown that damages resulted as a direct result of the conspiracy.

In this case, we think there was a total failure to prove that any damages resulted by reason of the alleged transaction. In fact, the plaintiff, Allen, must base his right to recover on the sale from Ramsey to the Sunray Oil Company, which was the result of the transaction or conspiracy complained of; therefore, he was not damaged, but, on the other hand, he was materially benefited as a result of the transaction, if he had an enforceable contract with Ramsey.

A case in many respects analogous to this case is Sleeper v. Baker (N. D.) 134 N. W. 716, 39 L. R. A. (N. S.) 864. This action was one brought by S. H. Sleeper, the appellant, to recover damages for the breach of two contracts, one with the defendants

G. W. Baker and C. E. Brace, copartners, known as Baker & Brace, and the other with Frank D. Banta and Lincoln Banta, copartners, known as Banta Bros., and joining these defendants, and each of them, as individuals, in a tort action by reason of an alleged conspiracy to break said contracts. The first count of the complaint is on the contract against the defendants Baker & Brace. It first sets up a contract between the plaintiff, Sleeper, and the defendants Banta Bros., wherein and whereby it was agreed that the plaintiff, Sleeper, should furnish lands for sale to purchasers to be furnished by the defendants Banta Bros., and that for each acre sold to the purchaser furnished by the Banta Bros., the plaintiff should allow them the sum of $3 per acre, and a refund of $29 railroad fare for each purchaser who actually purchased land shown by the said plaintiff, Sleeper, to said defendants, or their customers.

The second count of the petition is on the contract against Banta Bros., substantially alleging that in the sale of lands Banta Bros. & Company, a copartnership, and Frank D. Banta and Lincoln Banta, received as commissions on sale of lands and retained lands by way of commission, in a sum of not less than $35,000.

The third count purports to be an act in conspiracy, alleging that relying upon the contract that the plaintiff had with the several defendants, and in fulfilling the same, the plaintiff spent large sums of money and time in showing prospective purchasers the lands sold, and furnished buyers to Baker & Brace, and furnishing lands to Banta Bros., complying in all respects with the terms of his contract, and, in pursuance and performance of his contracts, procured and introduced to the defendants Baker & Brace, as purchasers for lands, and did procure sale of lands for the said Banta Bros., that the defendants falsely and fraudulently, with intent to cheat and defraud the plaintiff, conspired together to prevent the plaintiff from collecting his commissions due by reason of said sales.

The court, in passing upon this count of plaintiff's petition, uses this language:

"We must remember at the outset that although the complaint seeks to establish a conspiracy, mere opprobrious epithets do not change in any way the nature of the action. The action is a civil and not a criminal one, * * * 'though in the old books, such actions are called conspiracies, yet they are nothing, in fact, but actions upon the case.' It is generally only when men conspire to violate the primary, and not the mere contractual rights of another, that the civil action of conspiracy will lie. As one authority puts it, 'an act, which, if done by one alone, constitutes no ground of an action on the case, cannot be made the ground of such action by alleging it to have been done by and through a conspiracy of several'. The qual'ty of the act and the nature of the injury inflicted by it,' the courts say, 'must determine the question whether the action will lie'."

Although there are a number of cases to the contrary, the weight of American authority seems to hold to this rule. See 1 Jaggard, Torts, p. 636; 1 Addison, Torts, p. 7. Even the cases which are often cited in contradiction to it often fail to bear out the contention of their proponents.

In the case of Van Horn v. Van Horn, 52 N. J. L. 284, 10 L. R. A. 184, for instance, the act was done by an outsider, and was a malicious libel to character and to business, and the same is true of Lally v. Cantwell, 30 Mo. App. 524.

In the leading minority case of Angle v. Chicago, St. Paul, M. & O. Railroad Co., 151 U. S. 1, 38 L. Ed. 55, 14 S. Ct. Rep. 240, upon which plaintiff relied, there are to be found both a malicious motive, positive tortious acts, and positive injury, which an action on a contract against the contracting party could hardly have reached. Also a line of cases where laborers are induced to break their contracts of employment which hold to a contrary rule.

The court says the rule, as we see it, is substantially this:

"That an action cannot, in general, be maintained for inducing a third person to break his contract with the plaintiff, the consequence, after all, being only a broken contract, for which the party to the contract may have his remedy by suing upon it."

We do not, however, have to look for authority outside of our own state to determine the questions involved in this case, as we view them. For, in the case of Nance et al. v. Menefee, 112 Okla. 61, 242 P. 224, our court said in the first syllabus paragraph:

"No civil liability arises by reason of a conspiracy unless something is actually done by one or more of the conspirators pursuant to the scheme and in the furtherance of the object, which act results in damage. The gist of the action is the damage, and not the conspiracy. And the damage must appear to have been the natural and proximate consequence of defendant's act. No recovery can be had for damages which are uncertain, contingent and remote."

Second syllabus paragraph:

"A debt due from one person to another cannot be satisfied by the recovery of damages from another person unconnected with and a stranger to the contract whereby the debt or obligation is created. The creditor can recover damages only in satisfaction for an injury suffered, not on account of a debt due, and in satisfaction of it."

The facts in this case are very similar to the case at bar. Menefee, the defendant in error in this case, was engaged in the real estate business in Pauls Valley. Mary F. Morgan, one of the defendants, listed certain residence property in Pauls Valley with Menefee for sale for a price of $5,500, and agreed to pay him a commission of five per cent. Menefee showed the property to the defendant, Walter Nance, and priced it to him at $5,500. Nance refused to take the property at that price, but afterwards communicated with the owner and finally purchased the property for a price of $4,750. Mrs. Morgan was willing to sell the property for the latter price, provided she could avoid paying a commission. She went to the office of the plaintiff, Menefee, and attempted to discharge him as her agent and advised him she would not pay a commission. She also notified Nance that she would not pay a commission. It was agreed between Mrs. Morgan and Nance and Reel, the other defendants, that Mrs. Morgan would convey the property to Reel, who would then convey the property to Nance, unquestionably for the purpose of defeating Menefee if he attempted to claim a commission. Menefee brought suit against Mrs. Morgan, Nance, and Reel, alleging a conspiracy to deprive him of his commission. Nance and Reel demurred to the petition, and, upon the trial, the plaintiff secured a judgment against all the defendants. The court, in reversing this case, held that there could be no recovery against Nance and Reel, using this language in the body of the opinion:

"It is admitted, apparently, that the conveyance to Reel was merely for the purpose of avoiding payment of the commission to Menefee, and that, in fact, it was a sale from Mrs. Morgan to Nance, and while this might be denominated a conspiracy, we are unable to see how any damages resulted to the plaintiff, Menefee, by reason of the acts and conduct of the parties in this transaction. If, in fact, he had an enforceable contract with Mrs. Morgan, the transaction would in no wise affect his rights. And if he was the procuring cause in bringing about the sale between Mrs. Morgan and Nance, he evidently had a cause of action against Mrs. Morgan for the commission, and the transaction, which he charges to be a conspiracy, did not affect his rights in any particular. He was in the same attitude or position that he would have been, had the deed been executed direct from Mrs. Morgan to Nance upon her refusal to pay the commission. And, if no damages resulted by reason of the conspiracy and as a direct result thereof, then no cause of action could exist as between the plaintiff, Menefee, and the defendants, Nance and Reel."

The case was followed and approved in the case of Sharpe v. Keaton, 117 Okla. 131, 245 P. 852. The court reversed the opinion of the trial court and ordered the case dismissed, using this language:

"The alleged cause of action here involved is based upon the fact that the defendant, Sharpe, interfered or meddled with the transaction between the plaintiff, Keaton, and the purchaser of the property, McKinney, and, in fact, negotiated the sale of the property to the McKinneys, without the knowledge or consent of the plaintiff, Keaton, and this conduct is alleged to have been in fraud of the rights of the plaintiff, Keaton. * * * The actions and conduct of the defendant, Sharpe, if admitted to be true, as alleged, would give rise to no cause of action in law or equity. If the plaintiff, Keaton, had a valid contract with the owner of the property, Rettig, and was the efficient or procuring cause of the sale by reason of the fact that he brought the purchaser and seller together, in such event, the plaintiff, Keaton, would be entitled to recover his commission for the sale, regardless of the interference or alleged fraud on the part of the defendant, Sharpe; and if the defendant, Sharpe, was instrumental in consummating the transaction, whereby the McKinneys purchased the property from Rettig, this could result in no detriment or loss of any kind to the plaintiff, Keaton, but would be in furtherance of his rights and his interest and would entitle him to his commission, which is the basis of his alleged cause of action against the defendant, Sharpe."

The plaintiff evidently realizes the weight of these two Oklahoma authorities, because after attempting to distinguish them from his own case, and we are convinced that his attempted distinction is a disinction without a difference, he suggests in his brief that these two decisions be reviewed and reversed. We do not agree with the plaintiff that these cases do not fairly set out and state the rule applicable in cases of this character, but we believe that they are based upon the well established rule, the modern rule, and are sound and logical, and, instead of being reversed, should be, and are, affirmed with approval.

In view of the doctrine therein and herein enunciated, we think the trial court properly sustained the demurrers, and directed a verdict in favor of what we have termed herein

the Tulsa defendants. In fact, we think the demurrers of the defendants to plaintiff's petition should have been sustained, and the trial court undoubtedly finally reached the same conclusion.

The only remaining question left for determination is whether the court erred in taking the case away from the jury and dismissing the same as to the defendant Ramsey. The trial court took the position that inasmuch as the action could not be maintained against the local defendants for the reason that the local defendants could not have been guilty of conspiracy, under all of the facts and inferences to be indulged the plaintiff in the case, when the case failed as to the Tulsa defendants, it must necessarily fail as to the defendant Ramsey; the trial court holding to the view that the district court of Tulsa county had no jurisdiction over the defendant Ramsey after the other defendants were let out of the case. In this position, we think the trial court was likewise correct.

In Haynes v. City National Bank, 30 Okla. 614, 121 P. 182, our court laid down the rule as follows:

"Before a summons can rightly issue from one county to another, the person served with the summons in the county in which the action is brought must have a real and substantial interest in the subject of the action adverse to the plaintiff and against whom some substantial relief may be obtained; and the action must be rightly brought in the county in which it is brought as against the persons served with summons in such county."

Sections 207, 234, C. O. S. 1921 (secs. 117, 167, O. S. 1931) which were in full force and effect at the time of the institution of this action, creating an exception to the general rule that a defendant may be sued only in the jurisdiction of his residence. But in order to give the court jurisdiction over joint defendants who are nonresidents of the county where the suit is brought and for which summons have been issued to another county, the averments of the petition and the proof on the trial must show that the plaintiff has a valid joint cause of action against the resident defendants on whom valid service is had, as well as against the nonresident defendants.

Judge Kennamer, in discussing this question in the case of Fisher v. Fiske, 96 Okla. 36, 219 P. 683, says:

"There is a valid distinction between a suit against tort-feasors when they are attempted to be held jointly and against them when they are attempted to be held severally and individually. In the former, the statute permits a nonresident to be brought in as a necessarily proper party; in the latter the nonresident cannot be forcibly made a party to the suit. Therefore, should it be determined at any time that the resident defendant is not properly a party, is not connected with the alleged liability of the nonresident, the nonresident cannot be held upon his several or individual liability outside of the county of his residence."

In this case the sole predicate of the jurisdiction of the district court of Tulsa county was the liability of the Tulsa defendants, jointly and severally, with the defendant Ramsey, and when it was determined that no cause of action had been stated or proven as against the Tulsa defendants, certainly Ramsey could not be validly held to individual liability in the Tulsa county tribunal, unless, of course, it can be said he waived his immunity. This he does not appear to have done. He filed a motion challenging the jurisdiction of the court at the very outset of the action. He again raised the jurisdictional question by his demurrer, and in his first answer he also objected to the introduction of evidence on this ground. He seems to have raised the question at every opportunity, unless it can be said that it was waived by the filing of an amended answer in which it was not specifically reserved. He asked for no affirmative relief in his answer. His defending the suit was merely under protest and without prejudicing his assertion of the lack of jurisdiction of the court.

We believe, therefore, and hold that when the court determined that there existed no liability on the part of those who resided within the court's jurisdiction, the court had no authority to further entertain the suit against Ramsey, the nonresident defendant.

There are some other questions raised by the plaintiff. We consider, however, the above and foregoing to be decisive of the matters involved in this appeal.

The judgment of the district court of Tulsa county is, therefore, in all things affirmed.

The Supreme Court acknowledges the aid of Attorneys Ross Rizley, D. P. Parker, and A. S. Dickson in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Rizley and approved by Mr. Parker and

Mr. Dickson, the cause was assigned to a justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., and RILEY, BUSBY, PHELPS, and GIBSON, JJ., concur.